IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

G.S., the Student, and K.S. and R.S., the )
Student's Parents )
)
v. )     No. 3:21-0364
)
CLARKSVILLE MONTOMERY )
COUNTY SCHOOL SYSTEM )

**To: The Honorable William L. Campbell, Jr., District Judge**

## REPORT AND RECOMMENDATION

G.S. is a teenaged girl. She brought this action, by and through her parents, K.S. and R.S. ("Plaintiffs"), under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*, appealing an adverse final order from a state administrative law judge ("ALJ") with respect to her rights under the IDEA and whether the Clarksville Montgomery County School System ("Defendant" or "CMCSS") had provided her with a free and appropriate public education as required by the IDEA for the 2018–2019 and 2019–2020 school years.

Before the Court are the competing motions for judgment on the administrative record filed by Plaintiffs (Docket Entry No. 25) and Defendant (Docket Entry No. 28). After consideration of the parties' arguments and of the administrative record as a whole, and for the reasons that follow, the undersigned respectfully recommends that Plaintiffs' motion be denied, Defendant's motion be granted, that the final order of the ALJ be upheld, and that this action be dismissed with no award of relief to Plaintiffs.[1]

---

[1] The action has been referred to the Magistrate Judge for case management and for a Report and Recommendation. *See* Orders entered July 13, 2021 (Docket Entry No. 15), and December 21, 2021 (Docket Entry No. 27).

# I. BACKGROUND

## A. IDEA

The IDEA offers federal funding to participating states, including Tennessee, for the purpose of providing a "free and appropriate public education" ("FAPE") to school-aged children with disabilities. 20 U.S.C. §§ 1411, 1412. In general, the IDEA aims to ensure that every child has a meaningful opportunity to benefit from public education. *S.B. v. Murfreesboro City Sch.*, 2016 WL 927441, at *5 (M.D. Tenn. Mar. 11, 2016) (Campbell, J.). The IDEA mandates that children with disabilities, to "the maximum extent appropriate," should be,

> educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

The "lynchpin" of the IDEA is a process referred to as the "individualized educational program" ("IEP"), which involves a meeting of the eligible student's parents, teachers, and representatives of the local educational agency, at which the parties discuss the child's progress and educational goals. *Id*. § 1414; *Gibson v. Forest Hills Local Sch. Dist. Bd. of Educ.*, 655 F. App'x 423, 426 (6th Cir. 2016) (citing *Honig v. Doe*, 484 U.S. 305, 311-12 (1988)). Based on discussions from this meeting, an IEP document is drafted, which "evaluates the child's academic achievement and functional performance, as well as her short-term and long-term goals." *Gibson*, 655 F. App'x at 426.

Under the IDEA, parents who consider their child's placement and/or IEP inappropriate and who believe that their child has been denied a FAPE have a right to an impartial due process hearing by a state or local educational agency. 20 U.S.C. § 1415(f) and (g). In Tennessee, the

"due process hearing" is conducted before an ALJ employed by the Secretary of State, Administrative Procedures Division, who is trained in special education law. *Id*. at 426-27; 20 U.S.C. § 1415; Tenn. Code Ann. § 49-10-606. Following exhaustion of this administrative remedy, the ALJ's decision may be appealed in federal court. 20 U.S.C. § 1415(i)(2). The IDEA empowers courts to "grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C)(iii).

### B. Background Facts[2]

G.S. is a fourteen-year-old girl who has been diagnosed with Adjustment Disorder with Anxiety, Specific Learning Disorder with Impairment in Reading, Expressive Language Disorder, and Dyslexia. She is currently a student at the Currey Ingram Academy ("Currey Ingram"), a private school at which her parents placed her in February 2020 of her sixth grade year after she had attended public schools within CMCSS since the third grade. G.S.'s teachers throughout the years described her as a likable and outgoing child who was teachable and had a good and caring disposition toward other students and her teachers. She also has parents who are actively involved in her education and care deeply about her well-being.

In August 2016, G.S. transferred to CMCSS, specifically to the Sango Elementary School ("Sango Elementary"), from an out-of-state school. At the time, she was in the third grade and had previously been found eligible for special education services under the eligibility category of Specific Learning Disability ("SLD") with a deficit in Basic Reading Skills. Shortly after entering CMCSS, she was evaluated by CMCSS staff and determined to be eligible for continued

---

[2] Unless otherwise indicated, these facts are taken from the parties' respective briefs and the sealed administrative record and are undisputed.

special education services under the same eligibility category.  *See* 9/2/2016 Eligibility Report

(Docket Entry No. 19-1) at 931-956.[3]

On September 2, 2016, the IEP team[4] met and an IEP was created for the 2016-2017 (3rd

Grade) school year.  *See* September 2, 2016 Notice, Docket Entry No. 19-1 at 957-56, and 3rd

Grade IEP, Docket Entry No. 19-1 at 959-975.  The IEP noted in the Present Level of

Performance ("PLOP") section for reading skills that G.S. "reads at a level significantly behind

her grade level peers" based upon reading assessments administered on August 26, 2016, and

included goals in the area of Basic Reading Skills and Pre-vocational Skills.  *Id.*  The IEP

provided for several classroom and standardized testing accommodations for G.S., including

abbreviated assignments, extra cues/prompts, planned/preferential seating, oral testing, additional

time for assignments and testing, no penalty for spelling/handwriting/sloppy, flexible scheduling

and setting, and text-to-speech and/or human readers for standardized state testing.  *Id.*  The IEP

provided G.S. with 30 minutes of reading intervention and instruction in a special education or

"pull-out" setting away from non-IEP students, but she was otherwise to learn and participate in

school in the general education setting amongst her peers, with the provision of some in-class

resources (55 minutes) for reading and pre-vocational areas.  *Id.*  G.S.'s parents signed and

consented to the IEP.

On August 14, 2017, an annual IEP team meeting occurred and an IEP was created for

the 2017-2018 (4th Grade) school year at Sango Elementary.  This IEP contained some revisions

of the sections for PLOP and Goals, slightly revised the classroom and testing accommodations,

---

[3] Unless otherwise noted and for ease of reference, this Report cites to evidence in the records by reference to its location in the docket of this case.

[4] The record reflects that either one or both parents attended every IEP meeting and thus all references in this Report to "the IEP team" include both the CMCSS staff in attendance and the parents.

4

but essentially continued the special services that were being provided to G.S. with no notable changes. *See* 4th Grade IEP, Docket Entry No. 19-2 at 1-15. G.S.'s parents signed and consented to the IEP.

On August 10, 2018, the IEP team again met to develop an IEP for the 2018-19 (5th Grade) school year. *See* 5th Grade IEP, Docket Entry No. 19-2 at 34-53. The PLOP section contained a revised summary from the prior IEP for reading skills, stating that G.S.:

> is able to segment sentences into words and segment words into syllables. She is able to also segment a word into sounds, and is able to recite phonemic rules and syllabication. However, she has difficulty with using and fluently reading text at times if not focusing.
>
> On the Pathdriver assessment given on March 1st, G.S. correctly read 30 of 37 words. This gives her an 81% accuracy but still falling at the 1st percentile for the national average. When G.S. is progress monitored at the 1st grade level, she was able to read 54 words correct per minute.

*Id.* The IEP noted that the PLOP was based upon reading assessments administered on August 26, 2016. *Id.* The 2018-2019 IEP included slightly revised goals in the area of Basic Reading Skills and Pre-vocational Skills and essentially continued the accommodations and special services that were being provided to G.S., including the out-of-class reading intervention and instruction and the additional classroom reading and pre-vocational services. *Id.* G.S.'s parents signed and consented to the IEP but noted in the parents' concerns section that they "have concerns about G.S.'s performance in math." *Id.* G.S.'s parents also brought to the IEP meeting a personal tutor who had been providing tutoring in reading skills to G.S. and signed a release permitting CMCSS staff to share information about G.S. with the tutor. *Id.* There is, however, no indication that any interaction or communication between the tutor and CMCSS staff occurred.

5

G.S. experienced difficulties in the classroom at the start of the fifth grade year, and her parents requested an IEP team meeting to discuss their concerns. CMCSS staff also had concerns about difficulties G.S. had shown so far that year with respect to focusing, starting/completing tasks, and the need for redirection. *See* October 26, 2018 Notice, Docket Entry No. 19-2 at 68-69. An IEP team meeting was held on October 26, 2018, that resulted in: (1) the completion of an eligibility report that G.S. remained eligible for special education services with a SLD in Basic Reading Skills, *see* October 26, 2018 Eligibility Report, Docket Entry No. 19-3 at 10-23; Exhibit 18; (2) an addendum to the IEP for the 2018-2019 school year; and, (3) a conclusion that G.S. receive additional testing that fall. *See* Notice and Eligibility Report.

The revised IEP retained the same PLOP for reading skills that was contained in the prior IEP, but it included a substantially revised section for pre-vocational skills and noted, for the first time in any of G.S.'s IEPs, that her behavior was a factor in her IEP development, including the answer "yes" to the question of whether her behavior impeded her learning or that of others and that the IEP would address that behavior with "goals and objectives." *See* IEP Addendum (5th Grade) 2018-2019, Docket Entry No. 19-2 at 54-67. The IEP Addendum also included a different pre-vocational goal of "[g]iven a directive, G.S. will comply with the given directive throughout the duration of the task or assignment with no more than 2 prompts for 80% of documented observations over 4 of 5 data prompts as determined by data collection." *Id.* The Reading Skills goal was also changed to "[g]iven an unfamiliar passage at her instructional level, G.S. will increase her words read per minute to 75 with 90% accuracy of 4 of 5 data points as determined by data collection." *Id.* The time and manner of extra reading and pre-vocational

services remained unchanged, but additional accommodations were provided for classroom testing in the form of adult transcription and assistive technology. *Id.*

As a result of the IEP team meeting, a comprehensive psychoeducational reevaluation of G.S. was performed to determine her present level of performance and behavioral functioning. Miranda Morris, the school psychologist at Sango Elementary, completed the reevaluation on December 13, 2018. *See* Docket Entry No. 19-3 at 24-34. After assessing G.S.'s records, reviewing classroom teacher evaluations, completing her own observation, and administering both an educational achievement test and a behavioral assessment system, Ms. Morris found that (1) G.S.'s reading and writing skills remained low and below average but that her math skills were average and (2) G.S. exhibited behavioral issues that were commonly associated with Attention-Deficit/Hyperactivity Disorder ("ADHD") but could not receive special education for an "Other Health Impairment" because she had not been evaluated and diagnosed by a physician as having ADHD. *Id.* Ms. Morris suggested that G.S. continue to receive special education reading intervention and that some type of positive behavior reward system might benefit G.S. from a behavioral standpoint. *Id.* In light of discussion at the IEP team meeting, G.S.'s parents also had G.S. evaluated outside the school to determine if she had ADHD. The evaluations did not result in a diagnosis of ADHD.

Upon the completion of the evaluations of G.S., another IEP team meeting was held on December 13, 2018, to discuss her situation. *See* Notice Docket Entry No. 19-2 at 70. The Notice indicated that "[a]though G.S. has symptoms of ADHD, she is not diagnosed. G.S. has dyslexia and is still struggling with basic reading skills. Therefore, her current placement in special education is appropriate to give her services and intervention for an SLD in basic

reading." *Id.* No changes to G.S.'s IEP were made as a result of the meeting and her special education services were continued in accordance with the IEP that was in place.

During G.S.'s fifth grade year, Donna Cooper was her general education teacher, and Christina Campbell was the special education teacher who provided reading intervention to G.S. Ms. Campbell used different reading programs, including Read Well and Orton-Gillingham, and then began using the Read Live structured literacy program, which she believed provided a more individualized approach to interventions. According to Ms. Campbell, G.S. made steady progress in fifth grade with the reading program, her repeated reading scores improved, her fourth to fifth grade state-wide testing scores almost doubled in the fifth grade, and she rose from a level 1 in fourth grade to a level 2 in fifth grade for reading/language arts. Ms. Campbell also worked with G.S. on her pre-vocational behavior skills. In the spring of 2019, G.S. received math intervention through the Response to Instruction and Intervention ("RTI") program. Her final report card for the 2018-2019 school year included four Cs and one B.

The IEP team met again on April 2, 2019, near the conclusion of G.S.'s fifth grade year to develop her 2019-2020 IEP in anticipation of her move to Richview Middle School ("Richview Middle") for her sixth grade year. The Notice of the IEP meeting stated that "[d]ata supports that an increase in services will help G.S. to access the general education curriculum as the rigor and pace increase in middle school." *See* April 2, 2019 Notice, Docket Entry No. 19-3 at 8-9. The IEP included a PLOP for readings skills as follows:

> G.S. is currently being progress monitored on the 2nd grade level and reading approximately 65 wcpm with 95% or better accuracy. This is an improvement from being at the first grade level at the beginning of 5th grade. Her trend line predicts that she would reach her IEP goals of 75wcpm by the end of this school year. On Fastbridge Reading CBM G.S. read[s] 59 wcpm with 98% on the 5th grade passages.

8

*See* 6th Grade IEP Docket Entry No. 19-2 at 71-84. The PLOP was based upon reading

assessments from March 13, 2019, and noted that she remained in the first percentile. *Id.* The

IEP included two goals for basic reading skills as follows:

> [g]iven an unfamiliar passage at her instructional level, G.S. will increase her
> words read per minute to 75 with 90% accuracy over 4 of 5 data points as
> determined by data collection,

and

> [w]hen given a passage to read aloud for one minute, G.S. will read at least 85
> words per minute with no more than 3 errors as measured by weekly progress
> monitoring.

*Id.* The IEP continued to indicate that G.S.'s behavior was a factor that impeded her learning or

the learning of others and included two pre-vocational goals for G.S. as follows:

> [g]iven a directive, G.S. will comply with the given directive throughout the
> duration of the task or assignment with no more than 2 prompts for 80% of
> documented observation over 4 of 5 data points as determined by data collection

and

> G.S. will display behaviors appropriate for middle school and her age 75% of the
> time as measured by daily teacher observation.

*Id.* The IEP modified the classroom and testing accommodations for G.S. to offer additional

accommodations and increased from 30 minutes to 55 minutes the number of daily minutes

"pull-out" reading intervention that G.S. would be provided in a special education setting. *Id.*

The IEP also provided for 10 daily minutes of meeting with her case manager to work on pre-

vocational goals. All other aspects of the school day were to be a part of the general education

setting with inclusion support in that setting. *Id.* G.S.'s parents signed and consented to the IEP.

G.S. began the sixth grade year at Richview Middle and received special education

services in accordance with the 2019-2020 IEP that had been developed the prior spring. During

her time at Richview Middle, Angelica Encinas was G.S.'s special education reading

intervention teacher, and her special education caseworker was Amanda Economos. Ms. Economos monitored G.S.'s overall progress related to her IEP and met with G.S. three times a week at the start of the day to work on organizational and pre-vocational skills. Tayna Streeter was the school psychologist at Richview Middle. Unlike her daily instruction at Sango Elementary, G.S. rotated to different class periods with different teachers at Richview Middle for her various daily classes.

Ms. Encinas used three types of screening programs to assess G.S. and her other students – the San Diego Quick Assessment, the Phonological Awareness Skills Screener, and the Quick Phonics Screener – and also used the FastBridge reading program and the easyCBM reading program as screening tools. These screenings were conducted at the start of the school year and then periodically throughout the year. Ms. Encinas used structured reading programs such as the Basic Reading Inventory and MobyMax reading programs during her reading intervention time and combined a variety of programs into a multi-sensory approach. Ms. Encinas did not continue to use the Read Live program that was used with G.S. at Sango Elementary. The reading interventions conducted with G.S. were held in small group classes with approximately 10-12 students, and weekly progress monitoring was conducted as part of the class. During 9 weeks of the sixth grade year Ms. Encinas was assisted by a student teacher.

As the school year began and during the following weeks, G.S. struggled with the transition to a middle school environment and several notable events occurred regarding her current and future education. On the parent-based side, her parents: (1) obtained a private educational assessment of G.S. on September 7, 2019, by Sandy Parus, a dyslexia reading specialist and practitioner with Middle Tennessee Educational Therapy, *see* Parus Assessment,

Docket Entry No. 19-3 at 92-96;[5] (2) obtained a comprehensive psychoeducational evaluation of G.S. from Currey Ingram, *see* Currey Ingram Evaluation, Docket Entry No. 19-3 at 147-174;[6] and, (3) began to explore options for educating G.S. in a private school. On the school side, G.S. underwent testing and screening in late August and early September for both reading skills and reading fluency and pre-vocational skills to assess her present levels of performance. She was also observed by her new teachers at Richview Middle.

Given these events, the IEP team met again on September 24, 2019, to review and a new IEP was created. *See* 6th Grade IEP Addendum, Docket Entry No. 19-3 at 118-132. As G.S.'s special education caseworker, Ms. Economos was responsible for drafting this IEP. The Notice issued for the meeting stated the revision to the IEP was proposed "in order to bring G.S.'s IEP up to date with what she needs for the middle school setting" and that continuing with the current IEP was rejected "because data collected from teachers, fall screening process, and progress monitoring indicate that G.S. needs more support to be put in place." *See* September 24, 2019 Notice, Docket Entry No. 19-3 at 144-145.[7] G.S.'s parents had shared the Parus Assessment with CMCSS staff prior to the meeting. Ms. Economos and Ms. Encinas both reviewed the assessment, and Ms. Economos took into consideration the recommendations of the assessment when writing the new IEP. Although the final Currey Ingram Evaluation was not completed

---

[5] The Parus Assessment generally confirmed that, while G.S. had strong listening comprehension and cognitive abilities, she had significant deficits in foundational reading skills and mastery, stemming from her dyslexia, and remained in the lowest testing percentiles. The Assessment recommended that G.S. be provided intensive intervention using a multi-sensory, structured literacy approach and listed several accommodations that would allow her to access the curriculum being provided to her given her dyslexia.

[6] The final Currey Ingram Evaluation is a 28 page comprehensive report, which confirms G.S.'s educational deficits, both in reading and math skills, in great detail and provides a lengthy list of recommendations.

[7] Although this notice lists April 2, 2019, as the meeting date, the parties clarified and agreed during the administrative hearing that September 24, 2019, is the correct date.

11

until November 2019, G.S.'s parents had received a summary of the Currey Ingram Evaluation prior to the IEP Team meeting but did not share the summary with CMCSS staff prior to the meeting.

As a result of the meeting, G.S.'s parents included the following in the new IEP as their statement of concerns regarding G.S.'s education:

> G.S.'s parents are utterly and thoroughly dismayed at her progress since entering the Montgomery Clarksville School District. G.S. has shown little to no progress in almost all areas and in fact, has actually declined in several areas. G.S. is currently reading at low 2nd grade level. According to the school system testing, the only area where she has shown some progress is in her phonological awareness skills. However, this is due to the private tutoring her parents have G.S. in, twice a week utilizing the Wilson Reading System. This is proven by G.S.'s higher scores on phonological awareness and very low scores on the r-controlled syllables, which she has not yet reached in her tutoring sessions. The parents have continually requested that G.S.'s education be enhanced by a multi-sensory, structured literacy approach such as Orton-Gillingham or Wilson Reading with a certified instructor. As G.S. academic needs are not being met, her frustration as well as the parents, are growing. It is the parent's opinion that G.S. is now being targeted as a behavioral problem. This is further reinforced by her new pre-vocational goals. The parents firmly believe that if G.S. was getting the instruction and support, without negativity, her academics and behavior would improve as she is being engaged.

*See* IEP Addendum, Docket Entry No. 19-3 at 120. G.S.'s parents were represented by an attorney at the IEP team meeting and ultimately signed and consented to the IEP despite the expression of their concerns that they included in the new IEP.

The new IEP contained updated PLOP information for basic reading skills, reading fluency, and pre-vocational skills as follows:

> Basic Reading Skills – G.S. scored 96/100 on the Phonological Awareness Skills Screener. She scored 10/10 in the following areas: word discrimination, rhyme production, syllable blending, syllable segmentation, syllable deletion, phoneme recognition, phone [sic] blending, and phoneme segmenting. She scored 9/10 on rhyme recognition. G.S. scored 7/10 on phoneme deletion. G.S. scored in the 6% percentile on the AUTOreading Fall Screener through Fast Bridge.

G.S.'s deficit in basic reading skills causes her to struggle to decode both grade level and non-grade level words independently. She requires accommodations and modification in order to access materials across all content areas.

Reading Fluency – When given three one-minute grade level passages to read aloud, G.S. read 56/61 WCPM, 40/48 WCPM, and 45/51 WCPM for a score of 44, which places her in the 1%ile sic on the Fall Screener through Fast Bridge.

G.S.'s ability to fluently read grade level passages is affected by her struggle with basic reading skills. This causes her to need materials to be read aloud in order to access the content.

Pre-Vocational - Based on the Pre-vocational Skills Checklist completed by four of G.S.'s teachers, she has mastered an average of 27% of the items listed. G.S. arrives at the right place at the right time, has a good attendance record, accepts praise from others appropriately, and has a good self-esteem.

G.S. struggles with displaying age appropriate behaviors in her classes. She frequently distracts her classmates, blurts out, refused to follow directions from her teachers, and at times, refuses to work on assignments. These behaviors cause G.S. to miss out on concepts being taught, which in turn causes her to struggle to complete assignments.

*Id*. New goals were also included for these three areas as follows:

Basic Reading Skills – When given an assortment of instructional level practice tools and assessments for foundational reading skills (phonics and word recognition), G.S. will correctly identify nonsense words with 80% accuracy as measured by weekly progress monitoring.

Fluency – When given an instructional level passage to read aloud for one minute, G.S. will read at least 80 words per minute with no more than 5 errors as measured by weekly progress monitoring.

Pre-vocational – G.S. will work on undesired tasks given (group work, individual assignment, etc.) during each class period for a minimum of 75% of the class period as monitored by daily teacher observation.

*Id*.

Classroom and testing accommodations listed in the new IEP were revised to include several additional accommodations. *Id*. The new IEP continued to provide G.S. with 55 minutes of daily "pull-out" reading intervention in a special education setting and added 15 minutes of

"pull-out" intervention three times a week for pre-vocational skills. All other aspects of the school day were to be a part of the general education setting with inclusion support in that setting. *Id*.

In addition to the new IEP, the Notice for the IEP team meeting states that the team discussed completing a referral for assistive technology[8] and creating a Positive Behavior Plan v. a Functional Behavior Assessment/Behavior Intervention Plan for G.S. due to behaviors she was exhibiting at school. *See* September 29, 2019 Notice. During October the Richview Middle technology coach and the school district's assistive technology coordinator met with G.S. about her need for assistive technology. They determined that the laptop that G.S. had already been provided included additional assistive features that had been added to it, and that there was no need for her to be given an additional tool, such as an iPad. *See* Docket Entry No. 19-3 at 182-84. Although Ms. Economos began to work on creating a positive behavior plan for G.S., one was not in place prior to G.S. withdrawing from CMCSS. *See* Docket Entry No. 19-3 at 185.

Not included in the IEP or in any discussion memorialized in the Notice for the IEP team meeting was any reference to G.S.'s deficits in math. The school screening that took place for students in late August 2019 showed that G.S. scored at a high risk for a math deficiency. This was not inconsistent with her past history of low screening scores in math, or with her history of past placements in the RTI program for students who had deficits in math but were not under an IEP for math deficits. In the fifth grade, G.S. had received math intervention, and her parents had stated on her initial IEP for sixth grade that they were concerned about her performance in math. The record is unclear as to exactly what type of math education G.S. was receiving once

---

[8] Although each of the IEPs provided for the use of some level of assistive technology in the form of test-to-speech technology for testing purposes, each IEP listed "No" as the answer to the question "is assistive technology necessary in order to implement the student's IEP?" that is a part of the "Consideration of Special Factors for IEP Development" part of the IEP.

the sixth grade year started and what her achievement was in math during that year. While G.S.'s parents indicated that they expressed concerns about her math performance to her IEP team, there is no indication in the record that they requested an evaluation of G.S. for a SLD in math prior to or during her sixth grade year.

In the two months following the new IEP, G.S.'s teachers and parents exchanged multiple emails about G.S. with respect to her daily education, her classroom behavior, and the implementation of the IEP accommodations. G.S.'s parents shared the final Currey Ingram Evaluation Report with Ms. Economos on November 11, 2019, who in turn shared the report with Ms. Encinas and Tanya Street, a CMCSS school psychologist. *See* Docket Entry No. 19-3 at 175-77; Exhibit 46. This prompted discussion amongst Ms. Economos, Ms. Encinas, and Ms. Street about different options for G.S. with respect to math intervention and potential changes in her reading intervention when school resumed for the second semester after the holiday break.

Ms. Economos emailed and spoke with G.S.'s parents about these options at the end of November and early December. Generally, the option was to (1) place G.S. in a new RTI class to address her math deficits and determine whether she was eligible for a Specific Learning Disability in math and (2) move G.S. to a different reading class for a reading consultation because the teacher in that class was trained in the Orton-Gillingham reading system. Both moves would require a change of class schedules for G.S. and the reading intervention change would impact and require a change in her IEP because it would reduce the amount of special education direct reading instruction hours that she would receive.

After Ms. Economos emailed G.S.'s parents on November 25, 2019, about the options, the attorney for G.S.'s parents sent an email to counsel for CMCSS on November 27, 2019, stating the parents' intent to enroll G.S. in a private school at the school district's expense. It is

unclear from the record whether this information was communicated to any staff at Richview Middle. It is further unclear whether G.S. remained at Richview Middle after November 27, 2019. Nonetheless, Ms. Economos sent an email to G.S.'s parents about the options on December 10, 2019, after speaking with them at the school that morning. *See* Docket Entry No. 19-3 at 186; Exhibit 55. Although Ms. Economos indicated in the email that she was waiting for a decision from the parents about the change in the reading intervention, in response to the email, G.S.'s mother emailed Ms. Economos stating "[a]fter much consideration, we have decided to withdraw G.S. from Richview Middle School. She will not be returning after Christmas Break." *See* Docket Entry No. 19-3 at 209. Ms. Economos responded with an email stating, "[t]hank you for letting me know about your decision for G.S. We will miss having her here at Richview. I hope nothing but the best for her!" *See* Docket Entry No,. 19-3 at 188. Again, it is unclear whether G.S. remained at Richview Middle after the December 12, 2019, email.

G.S. began the 2020 spring semester at the Edison School, but she transferred from there to Currey Ingram after a few weeks and began school at Currey Ingram on February 2, 2020. G.S. has remained at Currey Ingram since that day. Currey Ingram provides a curriculum that is focused on educating students with learning differences. The hearing testimony shows that G.S. has made improvements in nearly all areas since enrolling at Currey Ingram.

### C. Administrative Proceedings

In February 2020, G.S., through her parents, exercised her rights under the IDEA and initiated an administrative due process complaint, alleging that CMCSS failed to provide FAPE to G.S. as required by the IDEA by: (1) failing to design IEPs for the 2018-2019 and 2019-2020 school years that were reasonably calculated to enable G.S. to make progress in light of her circumstances; and (2) failing to fully and thoroughly evaluate G.S. in all areas of suspected

disability for the purposes of educational planning, IEP development, establishing reliable baselines and understanding her learning style and service needs.[9] The due process complaint sought the following relief: (1) compensatory education for the failure to provide a FAPE during the 2018-2019 and first semester of the 2019-2020 school years to be paid in the form of funding for placement at Currey Ingram for the 2021-2022 school year and any other years required to place G.S. at the academic level she would have been if CMCSS had provided FAPE; (2) fund G.S.'s placement at Currey Ingram for the second semester of the 2019-2020 school year and the 2020-2021 school year; and (3) attorney's fees and costs associated with the due process case.

After a three day hearing during which 11 witnesses testified,[10] the ALJ determined that the relief sought should be denied and issued a Final Order on April 16, 2021. *See* Final Order (Docket Entry No. 13-1). As part of the Final Order, the ALJ made 130 specific findings of fact and made the following relevant enumerated conclusions of law:

> 7.      It is CONCLUDED that the Petitioners, here, have failed to prove any substantive harm and thus are not entitled to relief.
>
> 8.      Rather, it is CONCLUDED that based on the totality of the evidence, CMCSS designed Individualized Education Programs (IEPs) for the 2018-2019 and 2019-2020 school years that were reasonably calculated to enable G.S. to make progress in light of her circumstances and (2) CMCSS fully and thoroughly evaluated G.S. in all areas of suspected disability for the purposes of educational planning, IEP development, establishing reliable baselines and understanding her learning style and service needs.
>
> …

---

[9] The due process complaint also raised a violation of the Rehabilitation Act and the Americans with Disabilities Act. However, the only claims before the Court are claims for violations of the IDEA.

[10] Testifying at the hearing were CMCSS employees Dr. Patti Wilson, Christina Campbell, Miranda Morris, Donna Cooper, Angelica Encinas, and Amanda Economos, as well as private specialist Sandra Parus, who were all qualified as expert witnesses. Also testifying were CMCSS employees Taylia Griffith and Tanya Street, K.S., and Currey Ingram Middle School Division Head Mary Ragsdale.

11. It is CONCLUDED that G.S.'s IEPs met or exceeded the procedural requirements of the IDEA. CMCSS's IEPs were also substantively appropriate.

…

15. CMCSS thoroughly considered G.S.'s individual circumstances in developing an IEP that was reasonably calculated to enable her to make appropriate progress. It is CONCLUDED that the evidence shows that G.S.'s IEPs were substantively appropriate and were designed with her unique needs in mind for the purpose of providing her with access to educational services that were reasonably calculated to enable her to achieve passing marks and advance from grade to grade.

16. It is CONCLUDED that R.S. and K.S. [were] afforded the opportunity to meaningfully participate in the development of the IEPs for G.S. One or both parents attended all IEP meetings and were active participants.

…

18. It is CONCLUDED that CMCSS permitted and encouraged R.S. and K.S. to participate to the fullest extent of the law and, therefore, did not prevent them from meaningful participation in the IEP process.

…

20. It is CONCLUDED that Petitioners' unilateral private placement at [Currey Ingram] is not an appropriate program under the IDEA. The IEPs developed and proposed for G.S. met or exceeded the procedural and substantive requirements under the IDEA.

…

24. It is CONCLUDED that Petitioners' actions in unilaterally placing G.S. in a private school setting and seeking public reimbursement were not reasonable. Further, the Petitioners failed to notify the IEP Team at the last IEP meeting or notify CMCSS with at least 10 business days' notice that G.S. would be removed from CMCSS and placed in a private school and that they would be seeking public funds to cover the cost of the private placement.

…

28. It is CONCLUDED that the evidence does not support Petitioners' allegations against CMCSS or support the assertion that [Currey Ingram] is an appropriate placement under the IDEA. CMCSS has offered to provide FAPE and is not obligated to provide reimbursement for an inappropriate private placement.

18

29.     It is CONCLUDED that Petitioners have failed to prove that CMCSS denied G.S. FAPE and have failed to prove that [Currey Ingram] was an appropriate placement.

30.     It is further CONCLUDED that the Petitioners have failed to carry their burden of proof.

31.     It is CONCLUDED that CMCSS is the prevailing party on all issues.

*See* Final Order.

## II.  STANDARD OF REVIEW

When a party files a federal complaint seeking judicial review in an IDEA action, the district court engages in a distinctive form of review that has been described as a "modified *de novo*" standard, *Somberg v. Utica Cmty. Sch.*, 908 F.3d 162, 172 (6th Cir. 2018), under which the reviewing court is directed to "make an independent decision based on the preponderance of the evidence" while giving "due weight to the determinations made during the state administrative process." *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 849 (6th Cir. 2004) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 206 (1982)).  This review requires the court to independently re-examine the evidence. *Id.* (quoting *Doe v. Metro. Nashville Pub. Sch.*, 133 F.3d 384, 387 (6th Cir. 1998)).  However, "administrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 567 (6th Cir. 2000).

Originally developed in the Supreme Court's *Rowley* decision, the court's review is characterized as a two-part inquiry concerning: (1) whether the subject school district complied with the procedures set forth in the IDEA; and (2) whether the school district complied with the

19

substantive provisions of the IDEA by providing an IEP that is "reasonably calculated to enable the child to receive educational benefits." *Deal*, 392 F.3d at 853–54.  Although the IEP at issue must be "strictly review[ed] … for procedural compliance," a procedural violation does not constitute a denial of a FAPE unless it also produces substantive harm. *Id*. (citing *Knable v. Bexley City Sch. Dist.,* 238 F.3d 755, 764 (6th Cir. 2001)). And if the school system meets procedural requirements of the IDEA, "greater deference is to be afforded to" the school district's decision. *Dong v. Bd. of Educ. of Rochester Cmty. Sch.*, 197 F.3d 793, 800 (6th Cir. 1999).

As the party that challenges an IEP and/or asserts the denial of a FAPE, the parents bear the burden of proof at the administrative level to show that the IDEA was violated with respect to the public education of their child.  *Cordrey v. Euckert*, 917 F.2d 1460, 1469 (6th Cir. 1990). When challenging the decision of an ALJ and seeking relief from an administrative decision, the parents continue to bear the burden of proof at the district court level.  *Schaffer v. Weast*, 546 U.S. 49, 51 (2005).

### III.  PLAINTIFFS' CLAIMS

Plaintiffs' lawsuit is directed at G.S.'s fifth grade (2018-2019) and sixth grade (2019-2020) years and the IEPs for each of those years.  With respect to the fifth grade school year, Plaintiffs argue that CMCSS failed to provide G.S. with a FAPE by: (1) failing to develop an IEP that included current assessment data and related goals in Basic Reading Skills; (2) failing to consider whether assistive technology was required to implement her IEP; and (3) failing to develop pre-vocational goals that would address her executive function deficits.  *See* Plaintiffs' Memorandum in Support (Docket Entry No. 26) at 18-21.

Plaintiffs specifically argue that the PLOP section in the 2018-2019 IEP contained basic reading skills data that was from 2016 and was two years old, and that G.S.'s progress was assessed using fluency probes and goals, which Plaintiffs argue are not appropriate for assessing basic reading skills. Plaintiff further argue that, although G.S. was given a laptop to use in fifth grade, no actual assistive technology assessment of G.S. took place to assure that she received the types of possible assistive technology that would allow her to access her curriculum independently. Finally, Plaintiffs argue that the IEP included pre-vocational goals that were unrelated to the specific struggles that G.S. had with organization, focus, and attendance to the task at hand. Plaintiffs contend that more directed goals should have been included in the IEP to provide her with proactive assistance in eliminating some of the behavior that interfered with her education. *Id.*

With respect to the sixth grade school year, Plaintiffs argue that CMCSS failed to provide G.S. with a FAPE by: (1) failing to develop an IEP that included appropriate goals in Basic Reading Skills; (2) failing to provide appropriate reading instruction; (3) failing to address all deficit areas; (4) failing to consider whether assistive technology was required to implement her IEP; and (5) failing to develop pre-vocational goals that would address her executive function deficits. *Id.* at 21-25. Plaintiffs contend that the 2019-2020 IEP lacked basic reading skills data until it was amended in September and continued to set out goals that were not directly linked to G.S.'s reading skills deficits but were instead linked to fluency. Plaintiffs contend that G.S.'s pre-vocational goals were still inadequate because they failed to develop any proactive pre-vocational skills or provide any strategies that would assist G.S. with staying organized and on-task. Plaintiffs contend that the 2019-2020 IEP continued to fail to provide any assistive technology support to G.S. and that, although the IEP team agreed with G.S.'s parents' request to

provide an assistive technology evaluation, only an observation by CMCSS staff occurred and not a comprehensive evaluation. *Id.*

In addition to the above deficiencies that somewhat mirror those that Plaintiffs assert impacted the fifth grade IEP, Plaintiffs contend that G.S. was denied a FAPE in sixth grade in two other ways. They argue that the reading intervention provided by Ms. Encinas did not utilize an evidence based reading program and that interim progress reports addressing basic reading skills were not produced or provided to G.S.'s parents. They further argue that the 2019-2020 IEP was inadequate, that G.S. was not provided with a plan by CMCSS to address her deficits in math, and that G.S. was not specifically evaluated for a disability in math despite having documented math screening scores that would have supported an evaluation to determine if she qualified for special services in math. *Id.*

In contrast, Defendant contends in its motion for judgment on the administrative record that the ALJ correctly determined the due process complaint against Plaintiffs and that the ALJ's decision should be afforded deference in light of the specialized educational determinations that it made at the administrative level. Defendant contends that the administrative decision is supported by the ALJ's findings of fact and that there is no basis upon which to award Plaintiffs the relief they seek. *See* Defendant's Memorandum in Support (Docket Entry No. 30).[11]

## IV. ANALYSIS

The Court has reviewed the record in this case, including the entire administrative record. After such review, the Court finds that judgment should be granted to Defendant on the

---

[11] The Court notes that, despite having the benefit of nearly one month between the time Plaintiffs filed their motion and the time it filed its own motion, Defendant focuses its supporting brief primarily upon the ultimate conclusion that the ALJ's decision should be upheld and offers virtually no arguments that directly address the specific claims made by Plaintiffs in their motion. As such, Defendant's supporting memorandum is not particularly illuminating on any of the significant issues that are before the Court.

administrative record. While the Court is sympathetic to the Plaintiffs based upon the facts of the case and while the case presents a difficult decision, the preponderance of the evidence before the Court does not support a finding that G.S. was denied a FAPE by CMCSS for the 2018-2019 and 2019-2020 school years.

Several important principles of law guide the Court's review in this case. First, "[t]he primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the [IDEA] to state and local educational agencies in cooperation with the parents or guardian of the child." *Rowley*, 458 U.S. at 207. Second, "federal courts are 'generalists with no expertise in the educational needs' of students who have disabilities[.]" *Gibson v. Forest Hills Loc. Sch. Dist. Bd. of Educ.*, 655 F. Appx 423, 426 (6th Cir. 2016) (quoting *Fry v. Napoleon Cmty. Sch.*, 788 F.3d 622, 626 (6th Cir. 2015)). Third, and related to the first two points, "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Fourth, and finally, where the procedural requirements of the IDEA regarding the formulation of an IEP are met, "Plaintiffs are not entitled to prescribe or require a specific desired methodology[.]" *Renner v. Bd. of Educ. of Pub. Sch. of City of Ann Arbor*, 185 F.3d 635, 645 (6th Cir. 1999). "Formulating the IEP's substantive educational benefits most often concerns methodology, such as deciding between alternative programs or methods for educating a disabled student [and] these types of decisions require the school district's educational expertise." *L.H. v. Hamilton Cty. Dep't of Educ.*, 900 F.3d 779, 789 (6th Cir. 2018) (citing *McLaughlin v. Holt Public Schools Bd. of Educ.*, 320 F.3d

663, 673 (6th Cir. 2003)). With these principles in mind, the Court now turns to Plaintiffs' specific claims.

The Court rejects the claim that either the 2018-2019 or 2019-2020 IEP was procedurally deficient. The preponderance of the evidence shows that G.S.'s parents were provided with proper IEP notices and were offered a full role as collaborative members of the IEP team in the development of the IEPs. The preponderance of the evidence shows that IEP team meetings were held to amend the IEPs on two occasions when requested by G.S.'s parents and shows that the Parus Assessment that G.S.'s parents provided was reviewed and taken into consideration when Ms. Economos wrote the September 24, 2019 IEP. There is no evidence that G.S.'s parents were denied an IEP team meeting, were excluded from participating in an IEP team meeting, or were otherwise treated in any manner that would amount to a procedural violation of the IDEA.

The Court also finds that the IEPs were not procedurally or substantively deficient with respect to the PLOP and goals for G.S.'s basic reading skills or with respect to her pre-vocational goals. While Plaintiffs are correct in noting that the PLOP listed in the IEP for fifth grade stated that it was based upon reading assessments administered in August 2016, the actual content of the PLOP states that it was based upon a Pathdriver assessment that was given on "March 1." The evidence in the record shows that this reading assessment was administered on March 1, 2018, and was not, in fact, based upon information that was two years old. *See* Oct. 26, 2018 Eligibility Report, Docket Entry No. 19-3 at 19-20. The inclusion of the erroneous 2016 date therefore appears to be one of oversight and not of substance.

To the extent that Plaintiffs argue that the assessment in the fifth grade IEP and the reading skills goals contained in both the fifth and sixth grade IEPs were directed at fluency

24

instead of more basic reading skills, which Plaintiffs assert would have been a more accurate and appropriate manner of assessing G.S.'s reading skills deficit, the Court's review of the record shows that the CMCSS members of the IEP team believed that fluency assessment and goals were an appropriate educational method for assessing G.S.'s progress and setting goals for her. The decision about the appropriate methodology is for the educators at CMCSS, *see McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 673 (6th Cir. 2003), and the difference of opinion about the appropriate methodology, even if based upon a reasonable and supported difference of opinion, does not provide a basis for overturning the ALJ's decision on this issue or for finding the IEPs to be deficient. Parents "have no right to compel a specific program or methodology." *Hupp v. Switzerland of Ohio Loc. Sch. Dist.*, 912 F. Supp. 2d 572, 598 (S.D. Ohio 2012) (citing *Tucker by Tucker v. Calloway Cty. Bd. of Educ.*, 136 F.3d 495, 505 (6th Cir. 1998)). Plaintiffs failed to present evidence showing that reliance upon fluency assessments and goals was so far outside the norm of what was appropriate that it can be said the CMCSS failed to develop and implement an IEP that was not reasonably calculated to ensure that G.S. received necessary educational benefits.

Similarly, the IEPs at issue clearly included pre-vocational goals that were specific and formulated to G.S. and to her individual needs as a rising fifth and sixth grader. For each of the IEPs at issue, the pre-vocational goals were updated and revised for G.S. Plaintiffs argue that different or additional goals could have been included in the IEPs that would have more directly addressed some of G.S.'s specific pre-vocational deficiencies. Again, however, the IEPs as written were not so minimal or inadequate that they can be legally characterized as procedurally or substantively deficient. Further, while the evidence shows some examples of instances when G.S.'s general education teachers deviated or did not strictly follow the classroom

accommodations set out in the IEPs with respect to methods to improve G.S.'s classroom organization skills and focus, the preponderance of the evidence shows that these were isolated and minor discrepancies that did not rise to material deviations from the IEPs. To the contrary, the preponderance of the evidence shows that G.S.'s special education and general education teachers actively worked to address and improve her organizational and focus deficits in a manner consistent with the pre-vocational goals and the program participation accommodations written into her IEPs.[12]

The preponderance of the evidence shows that the IEPs at issue were developed in recognition of G.S.'s unique and individual needs and with the purpose of advancing and fostering her educational and behavioral development in a meaningful way. The annual IEPs were created on a timely basis and amended IEPs were created on two occasions because of changed events and the need for revised IEPs. There is no evidence of material deviations between the IEPs and the services actually provided to G.S, and there is also no evidence that the school members on the IEP team disregarded the importance of the IEPs or gave short shrift to G.S.'s individual needs. Could the IEPs have been written in a more detailed manner? Yes. Could the IEPs have included different and/or additional assessments, goals, or information? Yes. But the question before the Court is not whether the IEPs at issue were the best possible or could have been different. "Any review of an IEP must appreciate that the question is whether

---

[12] The Court appreciates the parents' belief that CMCSS staff were focusing on G.S. as a behavioral problem after the possibility that G.S. may have ADHD was raised and after the IEP team included in her IEPs that her behavior impeded her learning or the learning of others. This is certainly a natural reaction from parents who were frustrated with their daughter's continued struggles in school despite the IEPs that were in place. However, the Court finds no evidence supporting a conclusion that she was "singled out" as a behavior problem. To the contrary, the Court finds that the preponderance of the evidence shows that CMCSS staff were merely recognizing behavior, focus, and organizational difficulties that existed with G.S., especially as she grew older and left the early elementary grades where some of these difficulties could be attributed to being a young child. Indeed, had CMCSS overlooked and failed to address these difficulties, it may have risked being found to have ignored her individual and unique needs.

the IEP is reasonable, not whether the court regards it as ideal*." Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 137 S. Ct. 988, 999 (2017); *G.A. v. Williamson Cnty. Bd. of Educ*, 2022 WL 885098, at *8 (M.D. Tenn. Mar. 25, 2022) (Crenshaw, J.). In the end, the Court finds that the IEPs at issue pass the reasonableness standard and satisfied the IDEA.

The Court finds by a preponderance of the evidence that no IDEA violation arises out of the fact that the IEPs did not state that assistive technology was necessary to implement the IEPs, as is argued by Plaintiffs. First and foremost, it is apparent that assistive technology was provided to G.S. despite the negative answer provided in the IEPs. The IEPs clearly included assistive technology accommodations for G.S. in the form of text-to-speech programs to use for testing, and the preponderance of the evidence shows that these were provided. The preponderance of the evidence also shows that G.S. was provided with a laptop computer to use in her classes and that this laptop computer had software on it that was directed at her reading skills deficits. Plaintiffs failed to provide any evidence at the hearing showing that they requested but were denied any type of other assistive technology or that they requested and were denied home use of the laptop. Finally, the preponderance of the evidence shows that the CMCSS assistive technology staff observed and assessed G.S.'s need for assistive technology in the fall of 2019 and determined that her laptop already contained the necessary software and setting and that an additional iPad would be duplicative. While Plaintiffs argue that this did not amount to a complete assistive technology assessment, they failed to provide any evidence at the hearing of what additional benefit would have arisen from an assessment, and failed to provide any evidence of substantive harm[13] due to the lack of a complete assistive technology assessment.

---

[13] Substantive harm arises when a procedural violation of an IEP seriously infringes on the parents' opportunity to participate in the IEP process, deprives an eligible student of an IEP,

Plaintiffs' next claim is that G.S. was substantively denied a FAPE because of the method of her reading instruction during her sixth grade year at Richview Middle. They argue that the reading intervention provided by Ms. Encinas did not utilize an evidence based reading program and that interim progress reports addressing basic reading skills were not produced or provided to G.S.'s parents. The Court finds that the preponderance of the evidence does not support Plaintiffs' claims. The administrative records shows that Ms. Encinas (1) used a variety of reading programs for her reading intervention with G.S. that were structured literacy programs, (2) used phonic and phonological awareness activities, and (3) focused on a multi-sensory approach. While it is accurate that Ms. Encinas never testified at the hearing that any of the reading programs that she used were "evidence based," she was not asked that question. Further, Plaintiffs, despite having their own reading specialist expert testify, offered no evidence that the reading programs used by Ms. Encinas were not evidence based.[14] The preponderance of the evidence simply does not support Plaintiffs' assertion that the reading intervention provided by Ms. Encinas was inappropriate and not reasonably calculated to enable G.S. to receive educational benefits and, thus, amounted to a substantive violation of the IDEA. This issue is also, at its core, a question of what was the appropriate educational methodology that should be used for G.S., a question to which the Court should afford deference to the educators and the ALJ. *McLaughlin*, 320 F.3d at 673 ("States and school districts should be afforded some discretion in determining what type of program is appropriate based on the individual needs of a disabled child.").

---

or causes the loss of educational opportunity. *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 520 (6th Cir. 2003).

[14] As found by the ALJ, Plaintiffs' own expert testified that a muti-sensory, structured literacy program was the type of reading intervention that she recommended for G.S.

To the extent that Plaintiffs raise the issue of not being given progress reports on the reading intervention, the evidence in the record contains a written progress reports for the period of late September through November 2019. *See* Docket Entry No. 19-3 at 133-137; Exhibit 34 and Exhibit 35. However, Ms. Encinas testified that weekly monitoring occurred and was compiled into nine-week progress reports that were provided to parents by the special education case manager. Clearly, weekly progress monitoring occurred. Although the failure of G.S.'s parents to receive reports during August and September 2019 is neither explained by nor apparent from the administrative record, Plaintiffs have not shown how this shortcoming, in and of itself, amounted to a denial of a FAPE to G.S.

Plaintiffs' final claim is that G.S. had math deficits that were known about and that her math screenings in August 2019 should have resulted in a review of her eligibility for a SLD in math. Because of this, they argue that CMCSS failed to address all of her deficit areas. This claim is difficult to determine based on the record before the Court, which is primarily directed at the issues of G.S.'s deficits in readings skills and her pre-vocational issues, and contains only bits and pieces of information concerning G.S.'s math deficits or how CMCSS addressed those deficits. There is clearly evidence that G.S. had some math screening scores that indicated that she was at high risk for a math deficiency. Nonetheless, there is also evidence that these deficits had been addressed in some manner by CMCSS, as shown by evidence that she was placed in the RTI program during at least her fifth grade year and testimony from her mother that she had moved between the different levels of the RTI program for math as her math scores changed.

Still, there is no evidence in the record: (1) that an eligibility evaluation for math had been requested by the parents but was denied; (2) that G.S. had an obvious but ignored deficit in math that would have qualified her for an eligibility status for a math SLD; (3) what G.S.'s

history of moving between different levels of the RTI program indicated; and, (4) what program changes would have resulted if G.S. had been found eligible for a SLD in a math deficit and how these changes would have impacted G.S.'s education during sixth grade and been different than the RTI program. Indeed, over the course of three days of testimony, there was very little testimony devoted to the issue of G.S.'s math deficits and how CMCSS addressed them. The Court finds it is also significant that there was no expert testimony from Plaintiffs on the issue of a math deficit and no expert testimony supporting a finding that a FAPE was denied because of CMCSS's failure to evaluate G.S. for a math disability. It is Plaintiffs' burden to prove that G.S. was substantively harmed and denied a FAPE based upon this alleged claim. However, there was simply minimal proof developed at the administrative hearing on this issue. Given the lack of proof on this issue, the Court cannot find in favor of Plaintiffs.

Because the Court finds that that no procedural or substantive violation of the IDEA occurred and that G.S. was not denied a FAPE, it is unnecessary to address the issues of whether proper notice was given to CMCSS of the parents' removal of G.S. from public school and whether Currey Ingram is a proper placement for G.S. under the IDEA that entitled Plaintiffs to reimbursement. *See Doe By & Through Doe v. Defendant I*, 898 F.2d 1186, 1192 (6th Cir. 1990) ("Because we have determined that appellant's IEP was appropriate, he is not entitled to reimbursement for the cost of private schooling. Appellant's parents removed him from the free public school and placed him in a private institution at their own peril. They are responsible for the cost of doing so.).

# RECOMMENDATION

Based on the foregoing, it is respectfully recommended that:

(1) Plaintiffs' motion for judgment on the administrative record be DENIED;

(2) Defendant's motion for judgment on the administrative record be GRANTED; and

(3) This action be DISMISSED.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of this Report and Recommendation to which objection is made. *See* Fed. R. Civ. P. 72(b)(2); Local Rule 72.02(a). Failure to file specific written objections within the specified time can be deemed to be a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Milton*, 380 F.3d 909, 912 (6th Cir. 2004) (en banc). Any responses to objections to this Report and Recommendation must be filed within 14 days of the filing of the objections. *See* Fed. R. Civ. P. 72(b)(2); Local Rule 72.02(b).

BARBARA D. HOLMES
United States Magistrate Judge